**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRIENDS OF PINTO CREEK; GRAND
CANYON CHAPTER OF THE SIERRA
CLUB, MARICOPA AUDUBON
SOCIETY AND CITIZENS FOR THE
PRESERVATION OF POWERS
GULCH AND PINTO CREEK,
                        *Petitioners,*

CARLOTA COPPER COMPANY,
                        *Intervenor,*

            v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
ENVIRONMENTAL APPEALS BOARD;
STEPHEN L. JOHNSON, Acting
Administrator, United States
Environmental Protection Agency,
                        *Respondents.*

No. 05-70785

OPINION

On Petition for Review of an Order of the
Environmental Protection Agency

Argued and Submitted
November 13, 2006—San Francisco, California

Filed October 4, 2007

Before: Procter Hug, Jr., A. Wallace Tashima, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Hug

13505

**COUNSEL**

Roger Flynn, Western Mining Action Project, Lyons, Colorado, for the petitioners.

D. Judith Keith, United States Department of Justice, Environmental Defense Section, Washington, DC; John S. Most, United States Department of Justice, Natural Resources Section, Washington, DC, for the respondents.

Amy R. Porter, Lewis and Roca LLP, Phoenix, Arizona, for the intervenor.

## OPINION

HUG, Circuit Judge:

In this case, we determine whether the Environmental Protection Agency ("EPA") properly issued a National Pollution Discharge Elimination System ("NPDES") permit under the Clean Water Act to Carlota Copper Company ("Carlota"). The permit allows mining-related discharges of copper into Arizona's Pinto Creek, a waterbody already in excess of water quality standards for copper. Based upon provisions of the Clean Water Act, the implementing regulations, and their applicability to the factual scenario of this case, we vacate the permit and remand.

## I. FACTUAL BACKGROUND

Pinto Creek is a desert river located near Miami, Arizona, approximately 60 miles east of Phoenix. It has been listed by the American Rivers Organization as one of the country's most endangered rivers due to threats from proposed mining operations. Pinto Creek and its riparian environs are home to a variety of fish, birds, and other wildlife, some of which are specially protected. Due to excessive copper contamination from historical mining activities in the region, Pinto Creek is included on Arizona's list of impaired waters under § 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), as a water quality limited stream due to non-attainment of water quality standards for dissolved copper.

Carlota proposed to construct and operate an open-pit copper mine and processing facility approximately six miles west of Miami, Arizona, covering over 3000 acres while extracting about 100 million tons of ore. Part of the operation plan includes constructing diversion channels for Pinto Creek to route the stream around the mine, as well as groundwater cut-off walls to block the flow of groundwater into the mine.

In compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., the U.S. Forest Service prepared an Environmental Impact Statement ("EIS"), after determining the project would potentially have a significant impact on the environment, and later finalized the document as its Final EIS ("Forest Service FEIS"). The Army Corps of Engineers also prepared an Environmental Assessment ("Corps EA") covering the physical construction of proposed diversion channels redirecting water from Pinto Creek and the Powers Gulch stream around the mine and into Pinto Creek. Because the proposed action would involve the discharge of pollutants into Pinto Creek, Carlota applied to the EPA for an NPDES permit under § 402 of the Clean Water Act, 33 U.S.C. § 1342, in 1996. The EPA ultimately issued the permit, and the Environmental Appeals Board ("Appeals Board"), the internal appellate board of the EPA, denied review.

## II.  ISSUES

A.  Whether the issuance of the permit to discharge a pollutant, dissolved copper, into Pinto Creek, which already exceeded the amount of dissolved copper allowed under the Section 303(d) Water Quality Standard, is in violation of the Clean Water Act and the applicable regulations.

B.  Whether the EPA's failure to include and regulate all discharges from the Carlota Copper

Mine in the NPDES permit violates the Clean Water Act and the applicable regulations.

C.    Whether the EPA complied with the requirements of the National Environmental Policy Act ("NEPA").

## III.   PROCEDURAL BACKGROUND

The EPA published for public comment a draft NPDES permit for Carlota in 1998. To fulfill its information-gathering requirements under NEPA, 42 U.S.C. §§ 4321-4370f, the EPA adopted the Forest Service FEIS and the Corps EA. In response to comments received on its draft NPDES permit, the EPA amended the draft permit by adding two new conditions—(1) requiring additional groundwater discharges to augment the stream flow into Pinto Creek, and (2) an offset provision whereby Carlota would be required to remediate sources of copper loading from an upstream inactive mine site called the Gibson Mine.

On June 30, 2000, the Arizona Department of Environmental Quality ("Arizona DEQ") certified the final permit with the two new conditions as meeting state water quality standards under § 401 of the Clean Water Act, 33 U.S.C. § 1341, and on July 24, 2000, the EPA issued an NPDES permit to Carlota, as well as a Record of Decision formally adopting the Forest Service FEIS and the Corps EA for the current permit.

On August 24, 2000, the Petitioners filed their first Petition for Review of the NPDES permit and the NEPA documents with the Appeals Board. The Petitioners argued that: (1) because Pinto Creek is an impaired water under the Clean Water Act, the EPA should establish a Total Maximum Daily Load ("TMDL") for copper discharges into Pinto Creek before issuing Carlota's permit, (2) the EPA did not provide public notice of and a public comment period for the two new permit conditions, (3) Carlota needed an additional NPDES

permit for discharges from the Gibson Mine site, and (4) the Forest Service FEIS and Corps EA documents did not consider environmental impacts of the two new permit conditions.

The EPA did not respond and, instead, withdrew portions of the challenged NPDES permit stating that the permit was not severable from the contested conditions and that the permit should be stayed pending final agency action. The EPA then prepared a supplemental environmental assessment ("EPA's supplemental EA") analyzing only the two new conditions. In response to the Petitioners' contention of the necessity to establish a TMDL, the EPA completed a TMDL for dissolved copper in Pinto Creek. The EPA then provided a public comment period, but only for the two new permit conditions and the EPA's supplemental EA. The Arizona Department of Environmental Quality issued a second certification under § 401 of the Clean Water Act in February 2002. In accordance with its new analysis, the EPA issued a Finding of No Significant Impact on February 27, 2002, determining it would not have to prepare a new EIS, and issued the permit.

On April 1, 2002, the Petitioners filed a second Petition for Review with the Appeals Board challenging the EPA's decision to issue the Carlota permit. The principal challenges were that: (1) the permit should have covered the diversion channels that discharged into Pinto Creek, (2) the EPA must regulate all project discharges, (3) the permitted discharges violated Arizona anti-degradation requirements and water quality standards, and (4) the EPA violated NEPA in several ways.

The Appeals Board entered its order denying review on September 30, 2004. The EPA issued the final NPDES permit to Carlota, and the Petitioners filed for review in this court.

## IV.  ANALYSIS

### A.  Objective of the Clean Water Act.

It is important to consider the objectives and purpose of the 1972 revisions of the Clean Water Act, which are presently applicable to the considerations involved here. 33 U.S.C. § 1251 (1987) provides:

> The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter — (1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985. . . . (3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited.

Under the 1972 revisions of the Clean Water Act, there is direct federal regulation of the discharge of pollutants from point sources. *Pronsolino v. Nastri*, 291 F.3d 1123, 1126 (9th Cir. 2002). "[P]oint sources of pollution are those [where the pollutant flows] from a discrete conveyance, such as a pipe or tunnel. Nonpoint sources of pollution are non-discrete sources" and are the responsibility of the states, with certain federal oversight. *Id.* at 1125-27. An example of a non-discrete source is runoff from a farmland or timber harvesting.

Our *Pronsolino* opinion provides a detailed description of the operation of the Clean Water Act. We here summarize the provisions pertinent to this case.

Under § 303 of the Clean Water Act, 33 U.S.C. § 1313, the states are required to set water quality standards for all waters within their boundaries, regardless of the sources of the pollution entering the waters. Pursuant to § 303(d)(1), 33 U.S.C. § 1313(d)(1), each state is required to identify those waters

that do not meet the water quality standard which is frequently called the "§ 303(d)(1) list." For impaired waters identified in the § 303(d)(1) list, the states must establish a TMDL for pollutants identified by the EPA. A TMDL specifies the maximum amount of pollutant that can be discharged or loaded into the waters from all combined sources, so as to comply with the water quality standards.

Each state is required to submit its § 303(d)(1) list and its TMDL to the EPA for its approval or disapproval. If the EPA disapproves either of those documents, the EPA is responsible for preparing that document. The state then incorporates its § 303(d)(1) list and its TMDL or the EPA's approved document into its continuing planning process as required by § 303(e), 33 U.S.C. §1313(e).

In this case, the state had prepared the § 303(d)(1) list, but it had not prepared a TMDL. Therefore, in response to the Petitioners' objection, the EPA prepared the TMDL utilized in its awarding of the permit.

## B.   Carlota's Discharge into an Impaired Waterway.

[1] The Petitioners contend that as a "new discharger" Carlota's discharge of dissolved copper into a waterway that is already impaired by an excess of the copper pollutant violates the intent and purpose of the Clean Water Act. Under the NPDES permitting program, 40 C.F.R. § 122.4(i) addresses the situation where a new source seeks to permit a discharge of pollutants into a stream already exceeding its water quality standards for that pollutant**.** Section 122.4 states in relevant part:

No permit may be issued:

. . . .

(i)    To a new source or a new discharger if the discharge from its construction or operation will cause

or contribute to the violation of water quality standards. The owner or operator of a new source or new discharger proposing to discharge into a water segment which does not meet applicable water quality standards or is not expected to meet those standards . . . and for which the State or interstate agency has performed a pollutants load allocation for the pollutant to be discharged, must demonstrate, before the close of the public comment period, that:

(1) There are sufficient remaining pollutant load allocations to allow for the discharge; and

(2) The existing dischargers into that segment are subject to compliance schedules designed to bring the segment into compliance with applicable water quality standards.

40 C.F.R. § 122.4 (2000).

[2] The plain language of the first sentence of the regulation is very clear that no permit may be issued to a new discharger if the discharge will contribute to the violation of water quality standards. This corresponds to the stated objectives of the Clean Water Act "to restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251(a) (1987). And that "it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited." 33 U.S.C. § 1251(a)(3) (1987).

The EPA contends that the partial remediation of the discharge from the Gibson Mine will offset the pollution. However, there is nothing in the Clean Water Act or the regulation that provides an exception for an offset when the waters remain impaired and the new source is discharging pollution into that impaired water.[1]

---

[1]It is questionable whether there really is an offset. *See* discussion in the next section.

The regulation does provide for an exception where a TMDL has been performed and the owner or operator demonstrates that *before the close of the comment period* two conditions are met, which will assure that the impaired waters will be brought into compliance with the applicable water quality standards. The plain language of this exception to the prohibited discharge by a new source provides that the exception does not apply unless the new source can demonstrate that, under the TMDL, the plan is designed to bring the waters into compliance with applicable water quality standards.

**[3]** The EPA argues that under the requirements of clause (1), there are sufficient remaining load allocations to allow for the discharge because the TMDL provides a method by which the allocations could be established to allow for the discharge. There is no contention, however, that these load allocations represent the amount of pollution that is currently discharged from the point sources and nonpoint sources, and there is no indication of any plan that will effectuate these load allocations so as to bring Pinto Creek within the water quality standards. The TMDL merely provides for the manner in which Pinto Creek *could* meet the water quality standards if all of the load allocations in the TMDL were met, not that there are sufficient remaining pollutant load allocations under existing circumstances.

With regard to the requirements of clause (2), the EPA argues that the requirement of "compliance schedules" pertains only to point sources for which there is a permit. This does not correspond to the plain language of clause (2), which provides "the existing discharges into that segment [of Pinto Creek] are subject to compliance schedules designed to bring the segment into compliance with applicable water quality standards." 40 C.F.R. § 122.4(i)(2) (2000).

**[4]** We examine that language utilizing the definitions provided in the regulation. The term "discharge" is defined to mean "the discharge of a pollutant." 40 C.F.R. § 122.2 (2000).

The term "discharge of a pollutant," is defined as any addition of any "pollutant" or combination of pollutants to "waters of the United States" from "*any point source*." *Id.* at § 122.2(a) (emphasis added). Thus, under the plain language of the regulation, compliance schedules are not confined only to "permitted" point source discharges, but are applicable to "any" point source.

The EPA contends that this would amount to a complete ban of the discharge of pollution to impaired waters. This is based on its misreading of the plain language of the regulation to state that the remediation has to be *completed* before Carlota's discharge. The plain language of clause (2) of the regulation, instead, provides that existing discharges into that segment (of the waters) are "subject to *compliance schedules* designed to bring the segment into compliance with applicable water quality standards." 40 C.F.R. § 122.4(i)(2) (2000) (emphasis added). This is not a complete ban but a requirement of schedules to meet the objective of the Clean Water Act.

**[5]** Here the existing discharges from point sources are not subject to compliance schedules designed to bring Pinto Creek into compliance with water quality standards. Thus, Carlota has not demonstrated that clause (2) of 40 C.F.R. § 122.4(i) has been met. This is the regulation upon which Carlota and the EPA rely for issuance of the permit.

Initially, Carlota and the EPA contended that the first and second sentences of § 222.4(i) could be construed to apply independently, thus not requiring compliance with clauses (1) and (2) when an offset would result in a substantial net reduction of pollution to the impaired waters. The Petitioners, on the other hand, maintained that the two sentences must be read together, not independently. However, the EPA subsequently asked the Appeals Board to assume, for purposes of this decision, that clauses (1) and (2) do apply. *See In re Carlota Copper Co.*, 11 E.A.D. 692, 766 (EAB 2004). Thus, we

are concerned in this case with whether the EPA required Carlota to fulfill all of the requirements of § 122.4(i), including clauses (1) and (2), in order to issue a permit to it as a new discharger.

The Respondents and Carlota rely on *Arkansas v. Oklahoma,* 503 U.S. 91 (1992) in support of their contentions. That case involved the issuance of a permit for a city in Arkansas to discharge effluent into a stream in Arkansas that entered a river that eventually flowed into Oklahoma. Oklahoma challenged the permit before the EPA, alleging that the discharge violated Oklahoma Water Quality Standards. In that case, the EPA found that the discharge would not lead to a "detectable change in water quality," which the Supreme Court held was supported by substantial evidence. *Arkansas*, 503 U.S. at 112. In the opinion, the Court stated that "the parties have pointed to nothing that mandates a complete ban on discharges into a waterway that is in violation of those standards. The statute does, however, contain provisions designed to remedy existing water quality violations and to allocate the burden of reducing undesirable discharges between existing sources and new sources. *See, e.g.* § 1313(d)." *Id.* at 108. Section 1313(d) of the Clean Water Act, referred to by the Court, is the one that provides for the establishment of water quality standards and TMDLs.

The Supreme Court in *Arkansas v. Oklahoma* also referred to § 1288(b)(2), which provides for the development of areawide programs to eliminate existing pollution in the context of area-wide waste treatment management. *Id.* That section provides details required of any plan to eliminate the pollution, including schedules, time lines, identification of agencies, and identification of measures necessary to carry out the plan.

The Appeals Board stated that prior Agency pronouncements "confirm our position that, rather than completely banning new source discharges, § 122.4(i) provides new sources

with the opportunity to obtain a permit if the requirements specified in that section are met." *In re Carlota Copper Co.*, 11 E.A.D. 692, 765 (EAB 2004). The prior Agency position quoted states:

> A new source or new discharger may, however, obtain a permit for discharge into a water segment which does not meet applicable water quality standards by submitting information demonstrating that there is sufficient loading capacity remaining in waste load allocations (WLAs) for the stream segment to accommodate the new discharge and that existing dischargers to that segment are subject to *compliance schedules* designed to bring the segment into compliance with the applicable water quality standards.

*Id.* (emphasis added). The language quoted by the Appeals Board from the prior agency action requires compliance schedules designed to bring the water segment into compliance with the applicable water quality standards.

[6] In Carlota's case, there are no plans or compliance schedules to bring the Pinto Creek segment "into compliance with applicable water quality standards," as required by § 122.4(i)(2), which Carlota and the EPA both acknowledge is the applicable section with which Carlota must comply. The error of both the EPA and Carlota is that the objective of that section is not simply to show a lessening of pollution, but to show how the water quality standard will be met if Carlota is allowed to discharge pollutants into the impaired waters.[2]

---

[2]The only step the EPA or Carlota has taken to meet the requirements of § 122.4(i)(2) is the partial remediation of the Gibson Mine discharge. The following statement illustrates the Appeals Board's erroneous view of the objective of § 122.4(i)(2):

> The goal of the proposal is not, as Petitioners and other commenters seemed to believe, the restoration of the entirety of Pinto Creek to water quality standards. While desirable, this is not the intent of the proposed action.

*In re Carlota Copper Co.*, 11 E.A.D. 692, 784 (EAB 2004).

**[7]** The EPA has the responsibility to regulate discharges from point sources and the states have the responsibility to limit pollution coming into the waters from non-point sources. If point sources, other than the permitted point source, are necessary to be scheduled in order to achieve the water quality standard, then the EPA must locate any such point sources and establish compliance schedules to meet the water quality standard before issuing a permit. If there are not adequate point sources to do so, then a permit cannot be issued unless the state or Carlota agrees to establish a schedule to limit pollution from a nonpoint source or sources sufficient to achieve water quality standards.

The EPA contends that it cannot be judicially compelled to act against point sources that are illegally discharging into Pinto Creek. The EPA notes that while it has the authority to act against violators, its decision to do so in ordering its priorities is a matter that is typically committed to its absolute discretion, citing *Sierra Club v. Whitman*, 268 F.3d 898, 903 (9th Cir. 2001) and *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985).

In Carlota's case, there is nothing in § 122.4(i) that compels the EPA to act against point sources that are violating the Clean Water Act by their discharges into Pinto Creek or requiring judicial review of the EPA's ordering of priorities in any failure to act. The requirement of § 122.4(i)(2) is simply a condition that must be met before a permit can be issued to a new discharger into impaired waters. There is no compulsion on the EPA to act against point source violators, as in *Sierra Club* or *Heckler*. The EPA remains free to establish its priorities; it just cannot issue a permit to a new discharger until it has complied with § 122.4(i)(2).

In this case, the Petitioners do not argue for an absolute ban on discharges into a waterway that is in violation of the water quality standards. Rather, the Petitioners point to the § 122.4(i) exception by which a new discharger can comply

with the Clean Water Act requirements. Those requirements simply were not met. Thus, no conflict exists with the Supreme Court's opinion in *Arkansas v. Oklahoma*.

## C.  Pollution From the Diversion Channels.

Carlota proposed to construct two diversion channels that would divert surface and groundwater around the mine facilities. The Pinto Creek diversion channel would extend approximately 5250 feet and then into Pinto Creek. The Powers Gulch stream diversion channel would extend approximately 7900 feet into the Powers Gulch stream, which eventually connects to Pinto Creek. Both channels will eventually add pollutants, including copper, into Pinto Creek especially from the groundwater that Carlota will be directing into the channels for discharge into Pinto Creek.

In order to block groundwater from entering the main Carlota Mine pit, Carlota will construct a cutoff wall down to bedrock that will divert the groundwater to the surface and into the Pinto Creek diversion channel. The Forest Service FEIS stated: "The cutoff wall would be an impermeable barrier extending from the surface down through the alluvium and into the bedrock. The cutoff wall would be designed to prevent water from moving toward the pit and would encourage the alluvial flow to surface into the diversion channel to be routed around the pit." *Fed. Envtl. Impact Statement for Carlota Copper Project*, Vol. 1, Ch. 2, p. 16 (1997). The Forest Service FEIS also noted that the alluvial groundwater that will enter the diversion channel contains dozens of pollutants, including copper, that will be added to Pinto Creek. According to the Forest Service FEIS, the amount of dissolved copper in this groundwater would be significant. In addition to the groundwater directed into Pinto Creek via the Pinto Creek diversion channel, a similar cutoff wall is proposed to direct groundwater into the Powers Gulch stream diversion channel and ultimately into Pinto Creek. Like the groundwater added to the Pinto Creek via the Pinto Creek diversion channel, the

groundwater added to the Powers Gulch stream contains elevated levels of copper and other pollutants. The EPA did not consider the copper contributions from the use of the proposed diversion channels and groundwater cutoffs. The Appeals Board refused to consider these additional sources of copper pollution because it was not raised in the first comment period for the permit.

In the Petitioners' first Petition for Review of the NPDES permit and the NEPA documents before the Appeals Board, the Petitioners contended, among other things, that the EPA had not allowed a comment period on the two new conditions added to the permit and that the EPA should establish a TMDL for copper discharges into Pinto Creek before issuing Carlota's permit. The EPA did not respond and, instead, withdrew portions of the challenged NPDES permit stating that the permit was not severable from the contested conditions and that the permit should be stayed until pending final agency action.

**[9]** After establishing a TMDL for copper in Pinto Creek, Carlota then pursued a renewal of the permit based upon 40 C.F.R. § 122.4(i). Carlota has conceded that for the purpose of this decision § 122.4(i), including clauses (1) and (2), is applicable. Carlota was thus proceeding on the basis that a TMDL had been issued and that it was required to comply with clauses (1) and (2). Section 122.4(i) requires that a new discharger into impaired waters for which a pollutant's load allocation for the pollutant to be discharged "must demonstrate, before the *close of the comment period*," the compliance with clauses (1) and (2). 40 C.F.R. § 122.4(i) (2000) (emphasis added). The comment period referred to could not have been the initial comment period before a TMDL was sought or established. The comment period had to relate to the new basis for Carlota's permit under § 122.4(i).

**[10]** All of the claims that the Petitioners now rely upon were raised during the comment period after the TMDL was

performed. They could not have been raised in the first comment period. These claims were made known to the EPA not only in the second comment period but also at the time of the preparation of the TMDL by a letter that raised the point, a copy of which was furnished directly to the EPA. Thus, the claim with regard to the copper discharge from the diversion channels and the cutoff walls was timely raised and should not have been deemed forfeited, but it should have been considered by the Appeals Board. This would be important in determining whether the requirement for compliance schedules set out in § 122.4(i)(2) had been met and also it would be important in determining the extent of the pollutants contributed by Carlota that would be offset by the Gibson Mine remediation.

## D.  The State of Arizona's Requirements.

In addition to violating 40 C.F.R. § 122.4(i), the Petitioners contend that the permit also violates the provisions of 40 C.F.R. § 122.4(d), which provides that no permit may be issued "[w]hen the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States." 40 C.F.R. § 122.4(d) (2000). This must be considered in connection with § 122.4(a), which states that no permit may be issued "when the conditions of the permit do not provide for compliance with the applicable requirements of the Clean Water Act or regulations promulgated under the Clean Water Act." *Id.* at § 122.4(a). Thus, the requirements of § 122.4(d) are in addition to complying with all of the requirements of the Clean Water Act and the regulations promulgated under the Clean Water Act.

[11] Since we here hold that the permit does not comply with § 122.4(i), the additional requirement of § 122.4(d) need not be considered at this time. It would be appropriate to consider the requirements of § 122.4(d) if a permit is properly issued under § 122.4(i).

### E.    Compliance With the Requirements of NEPA.

NEPA requires agencies to examine potential environmental effects of any proposed action, and to inform the public of its studies and resulting concerns. If any agency determines that its action may have a significant impact on the environment, the agency is required to prepare an EIS describing the impacts of the action and possible alternatives. 42 U.S.C. § 4332(2)(C) (1975). To determine if the action will require an EIS, the agency may first prepare an environmental assessment ("EA"). 40 C.F.R. § 1508.9 (1998). If the EA indicates that there will not be a significant impact on the environment, the agency may issue a Finding of No Significant Impact, in which case an EIS is not required. 40 C.F.R. § 1508.13 (1998).

**[12]** In the first appellate review before the Appeals Board, the Petitioners challenged the EPA's failure to allow comments on the two new permit conditions and also the failure to conduct a TMDL prior to issuing the permit. The supplemental EA issued by the EPA addressed only the environmental effect of the two new conditions, not the effect of a permit issued to a new discharger under § 122.4(i), including clauses (1) and (2). There is nothing wrong with incorporating and relying upon the Forest Service FEIS because it had discussed the effect on waters by the proposed Carlota Mine. However, the EA produced by the EPA should have discussed the revised permit issued under § 122.4(i), including clauses (1) and (2).

**[13]** The Petitioners argued that the EPA failed to take a "hard look" at its failure to consider the discharges from the two diversion channels, including the walls to be established to prevent groundwater from reaching the mine facilities, which would contribute alluvial water, including copper pollution, to Pinto Creek. The Appeals Board refused to consider this argument because it contended that it had not been raised during the first comment period. As we have previously

explained, it was not possible to comment upon the request for a permit based upon the TMDL and the requirements of § 122.4(i) until after the TMDL had been issued. Thus, for the reasons we expressed in the prior section, it was error for the Appeals Board not to consider additional discharges from the diversion channels.

**[14]** The Petitioners also raised other questions concerning the compliance with NEPA, such as reasonable alternatives to the proposed action. Because we have held that the permit was improperly issued under the provisions of § 122.4(i), including clauses (1) and (2), these NEPA issues need not be considered at this time.

## V.   CONCLUSION

Because the issuance of the NPDES Permit to Carlota Copper Mine was based on errors of law under the Clean Water Act, 40 C.F.R. § 122.4(i), and the NEPA, we vacate and remand the permit to the EPA for further proceedings consistent with this opinion.

**VACATED and REMANDED.**