DIOXIN/ORGANOCHLORINE CENTER; Columbia River United, Plaintiff–Appellants,

and

Longview Fibre Co., et al., Plaintiffs–Intervenors,

v.

Chuck CLARKE,* in his capacity as Regional Administrator, United States Environmental Protection Agency, Region 10; United States Environmental Protection Agency, an agency of the United States Government, Defendants–Appellees.

DIOXIN/ORGANOCHLORINE CENTER; Columbia River United, Plaintiffs,

and

Longview Fibre Co., a Washington corporation; James River II, Inc., a Virginia corporation; Boise Cascade Corporation, a Delaware corporation; Weyerhaeuser Co., a Washington corporation, Plaintiffs–Intervenors–Appellants,

v.

Chuck CLARKE, in his capacity as Regional Administrator, United States Environmental Protection Agency, Region 10; United States Environmental Protection Agency, an agency of the United States Government, Defendants–Appellees.

Nos. 93–35973, 93–36000.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 1994.

Decided June 22, 1995.

---

* Chuck Clarke is substituted for his predecessors, Dana A. Rasmussen and Gerald Emison, as Regional Administrator, United States Environmental Protection Agency, Region 10. Fed.R.App.P. 43(c)(1).

Todd D. True and Victor M. Sher, Sierra Club Legal Defense Fund, Seattle, WA, for plaintiffs-appellants.

Karen M. McGaffey, Bogle & Gates, Seattle, WA, for plaintiffs-intervenors-appellants.

Christopher Scott Vaden, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for defendants-appellees.

Before: WRIGHT, O'SCANNLAIN, and LEAVY, Circuit Judges.

LEAVY, Circuit Judge:

Appellants, environmental groups and paper and pulp mills, challenge on opposing grounds the district court's grant of summary judgment in favor of the Environmental Protection Agency ("EPA") on appellants' claims that the EPA violated the Clean Water Act ("Act"), 33 U.S.C. § 1251, *et seq.*, by establishing total maximum daily load limits for the discharge of the toxic pollutant dioxin into the Columbia River. We affirm.

## FACTS AND PRIOR PROCEEDINGS

In the late 1980's, a series of EPA-sponsored and independent biological studies revealed that high levels of 2,3,7,8–tetrachlorodibenzo–p–dioxin ("TCDD" or for the purposes of this appeal simply "dioxin"[1]) were accumulating in the tissue of fish located downstream from pulp and paper mills in the Columbia River Basin. These studies also confirmed that the mills themselves were a significant source of dioxin contamination as a result of their use of chlorine-based chemicals to bleach wood and other raw materials used in the paper production cycle.[2]

Oregon, Washington, and Idaho had already adopted applicable water quality standards under state law for waters in the Columbia Basin including the Columbia, Snake, and Willamette Rivers. The EPA found that these water quality standards limited the permissible ambient concentration of dioxin to 0.013 parts per quadrillion ("ppq") as provided in the EPA's Quality Criteria for Water tables issued in 1986.[3] Due in large part to the mills activity, the dioxin concentration in these waters exceeded the level permitted by the state standards.

---

1. "The term 'dioxin' commonly refers to a family of 210 structurally related chlorinated aromatic compounds known as chlorinated dibenzo-p-dioxins (CDDs) and chlorinated dibenzofurans (CDFs). The most toxic member of this family is 2,3,7,8–tetrachlorodibenzo-p-dioxin (2,3,7,8–TCDD).

... Based on the results of animal studies, EPA has classified 2,3,7,8–TCDD as ... by far the most potent carcinogen evaluated to date by the Agency.... This chemical is also the most potent reproductive toxin yet evaluated by the EPA." EPA Office of Pesticides and Toxic Substances, *Integrated Risk Assessment for Dioxins and Furans from Chlorine Bleaching in Pulp and Paper Mills,* (Jul.1990).

2. *Cf.* EPA's proposed rule on technological limitations applicable to pulp and paper mills. 58 Fed.Reg. 66095–96 (1994).

3. "The state water quality standard applicable to 2,3,7,8–TCDD in the Columbia River basin has been determined to be 0.013 ppq." EPA, TMDL Decision Document, *Total Maximum Daily Loading (TMDL) to Limit Discharges of 2,3,7,8–TCDD (DIOXIN) to the Columbia River Basin,* 2–2 (Feb. 25, 1991) ("TMDL").

Pursuant to 33 U.S.C. § 1314($l$), the states listed the mills as particular point sources believed to be impairing the water quality.[4] Section 1314 required the development of individual control strategies ("ICS") expressed as individual National Pollution Discharge Elimination System ("NPDES") permits which would result in the attainment of the applicable water quality standard within three years.[5]

Oregon, Washington, and Idaho also identified the Columbia River as "water quality limited" pursuant to § 1313(d)(1)(A), finding that the levels of dioxin being discharged into the Columbia River violated the applicable state water quality standards. Once the states had made this finding under § 1313(d)(1)(A), the states, pursuant to § 1313(d)(1)(C), or, the EPA, pursuant to § 1313(d)(2), were required to establish a Total Maximum Daily Load ("TMDL") for dioxin. *See* TMDL at 2–1.

A TMDL defines the specified maximum amount of a pollutant which can be discharged or "loaded" into the waters at issue from all combined sources. Thus a TMDL represents the cumulative total of all "load allocations" which are in turn best estimates of the discrete loading attributed to nonpoint sources, natural background sources, and individual wasteload allocations ("WLAs"), that is, specific portions of the total load allocated to individual point sources. When a TMDL and specific wasteload allocations for point sources have been established, any NPDES permits issued to a point source must be consistent with the terms of the TMDL and WLA. *See* 40 C.F.R. § 130.2.

The states decided against issuing TMDLs and WLAs on their own authority. Instead, after consultation and involvement in the development of the draft TMDL, the states requested the EPA to issue the proposed and final TMDL as a federal action under the authority of § 1313(d)(2). On June 14, 1990, the EPA published a proposed TMDL and invited public comment. On February 25, 1991, the EPA established the final TMDL for dioxin discharge into the Columbia River.

In *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1314 (9th Cir.1992), we dismissed consolidated appeals on this matter for lack of jurisdiction. The environmental groups, Dioxin/Organochlorine Center and Columbia River United ("DOC"), then filed this action in the United States District Court for the Western District of Washington on January 11, 1993. The mills, Longview Fibre Co., James River II, Inc., Boise Cascade Corp., and Weyerhaeuser Co. ("Mills"), also challenged the EPA's action. The parties filed cross-motions for summary judgment. On August 10, 1993, the district court granted EPA's motion for summary judgment and denied the motions of DOC and the Mills.

DOC argues that the TMDL developed by the EPA fails to conform to the water quality standards adopted by the states because it is not stringent enough. DOC asserts that the TMDL was based on arbitrary and capricious decisions by the EPA constituting an abuse of discretion. The Mills, on the other hand, argue that the EPA violated the Clean Water Act by issuing a TMDL prior to establishing less burdensome technology-based limitations which the Mills assert are required by

**4.** "[E]ach state shall submit to the Administrator ... for each segment of the navigable waters ... a determination of the specific point sources discharging any such toxic pollutant which is believed to be preventing or impairing such water quality and the amount of such toxic pollutant discharged by each such source." 33 U.S.C. § 1314($l$)(1)(C).

**5.** 40 CFR § 123.46 provides:

(a) Not later than February 4, 1989, each State shall submit to the Regional Administrator for review, approval, and implementation an individual control strategy for each point source identified by the State ... which will produce a reduction in the discharge of toxic

pollutants from the point sources ... sufficient, in combination with existing controls on point and non-point sources of pollution, to achieve the applicable water quality standards as soon as possible, but no later than three years after the date of the establishment of such strategy.

....

(c) For the purposes of this section the term individual control strategy ... means a final NPDES permit with supporting documentation showing that effluent limits are consistent with an approved wasteload allocation, or other documentation which shows that applicable water quality standards will be met not later than three years after the individual control strategy is established....

the Act before the EPA can establish TMDLs.

## ANALYSIS

### I. Environmental Group Claims

#### A. Standard of Review

Under the Administrative Procedure Act ("APA"), "the reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Longview Fibre*, 980 F.2d at 1313. We recently noted,

> [t]he APA does not give this court power "to substitute its judgment for that of the agency" but only to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *[Citizens to Preserve] Overton Park [, Inc. v. Volpe]*, 401 U.S. [402,] 416 [91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 [1971]. We may reverse only if the decision was "arbitrary and capricious" within the meaning of the APA, 5 U.S.C. § 706(2)(A), in that

> > the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir.1994) (quoting *Motor Vehicle Mfr. Ass'n v. State Farm Ins.*, 463 U.S. 29, 44, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983)).

#### B. Discussion

DOC contends that the TMDL fails to implement state water quality standards because it: 1) inadequately protects aquatic life and wildlife, 2) inadequately protects certain human subpopulations, and 3) fails to consider the cumulative effect of dioxin-related pollutants in the water system.

#### 1. The TMDL: Aquatic Life and Wildlife

DOC maintains that the EPA abused its discretion by arbitrarily and capriciously considering only the risk to *human* life and failing to consider the effect of dioxin on *animal* life.[6]

DOC first disputes the evidence relied upon by the district court to support its decision. In order to establish that it appropriately considered the effect of the TMDL on aquatic life and wildlife, the EPA filed in the district court an affidavit of Richard Albright. Albright was one of three principal EPA officials involved in the development of the TMDL. In his affidavit Albright stated:

> During development of the TMDL, it was determined that an ambient concentration of [dioxin] of .013 ppq was necessary to protect human health. In addition, I concluded during development of the TMDL that an ambient concentration of .013 ppq would be protective of aquatic life and wildlife, and would therefore implement the state narrative water quality standards for aquatic life and wildlife protection.

> In reaching this conclusion, I was aware of the data and analyses regarding the dioxin toxicity to aquatic life and wildlife contained in the following documents. The Fish and Wildlife Service Dioxin Hazard Document, ... EPA's Background Document to the Integrated Risk Assessment

---

**6.** The state water quality standards are as follows:

> Toxic substances shall not be introduced above natural background levels in the waters of the state in amounts, concentrations, or combinations which may be harmful, may chemically change to harmful forms in the environment, or may bioaccumulate to levels that adversely affect ... aquatic life; or other designated beneficial uses.
> OAR 340–41–205(p)(A)
> Toxic substances shall not be introduced above natural background levels in waters of the

state which may adversely affect characteristic water uses, [or] cause acute or chronic conditions to the aquatic biota.
WAC 173–201–047
> As a result of man-caused point or nonpoint source discharge, waters of the State must not contain: 01. Hazardous materials ... in concentrations found to ... adversely affect designated or protected beneficial uses. 02. Deleterious materials ... in concentrations that impair designated or protected beneficial uses without being hazardous.
IAPA 16.01.2200.

for Dioxins and Furans from Chlorine Bleaching in Pulp and Paper Mills, . . . and EPA's dioxin criteria guidance document, entitled "Ambient Water Quality Criteria for 2,3,7,8–tetracholoro–dibenzo–p–diozin," dated 1984. . . . The TMDL was intended and designed to provide protection to humans aquatic life and wildlife.

DOC discounts the significance of Albright's affidavit and contends that the documents referred to do not support the conclusion that the EPA had adequately considered the effect of the TMDL on aquatic life and wildlife. We consider each of the documents cited by Albright in order to determine whether they provide sufficient evidence to support the EPA's setting of a TMDL at 0.013 ppq to protect aquatic biota and wildlife.

a. EPA, Office of Water Regulations and Standards, *Ambient Water Quality Criteria for 2,3,7,8–Tetrachloro–dibenzo–p–dioxin,* (Feb. 1984).

DOC asserts that this document does not support the conclusion that a dioxin level of 0.013 ppq would protect fish and other wildlife. DOC quotes the study itself:

The data that are available concerning the effects of [dioxin] on aquatic organisms and their uses do not allow the calculation of an acute or chronic toxicity value for any freshwater animal species.

This report however indicates that the lowest level at which adverse effects on *aquatic life* had been noted was at 0.0001 micrograms per liter or 100 ppq. *Id.* B1–7. The ambient concentration of 0.013 ppq allows for a dioxin exposure only one ten-thousandth of that value.

b. EPA, Office of Pesticides and Toxic Substances, *Background Document to the Integrated Risk Assessment for Dioxins and Furans from Chlorine Bleaching in Pulp and Paper Mills.* (July 1990).

DOC argues that this document fails to establish that the TMDL was protective of aquatic life:

Currently sufficient data are not available concerning the chronic effect of [dioxin] . . . on *aquatic* life to derive national water quality or sediment criteria for these contaminants.

*Id.* at 13–(29–30) (emphasis added).

The district court, however, found that this document, while not containing a estimate of the toxicity of dioxin for *aquatic* life, did justify the EPA's decision in regard to *wildlife.* This document indicates that the lowest concentration at which adverse effects had been observed in wildlife feeding upon aquatic life contaminated by dioxin was at dioxin concentrations of 3 parts per trillion ("ppt") in the consumed food items.[7] The EPA estimates that the maximum fish tissue residues in food items expected under the TMDL are 0.07 ppt. This represents a level approximately ⅓₃rd of the level at which adverse effects had been observed.

c. U.S. Fish and Wildlife Service, *Dioxin Hazards to Fish, Wildlife and Invertebrates: A Synoptic Review,* Contaminant Hazard Reviews Report No. 8 (May 1986).

The Fish and Wildlife Service ("FWS") published this report in 1986. In it the FWS asserted that, "the limited data suggest that [dioxin] concentrations in water should not exceed 0.01 *ppt* to protect aquatic life, or 10 to 12 ppt in food items of birds and other wildlife." DOC argues that since the *Background Document* (b. above) recommended a lower figure of 3 ppt for a safe dioxin concentration in food items, this *Dioxin Hazards* report was "outdated and refuted by all the other more current evidence in the record."

The purpose of this document, however, is to establish that an 0.013 *ppq* ambient concentration of dioxin is protective of *aquatic life* in that the level set by the EPA is one one-thousandth of the 0.01 *ppt* level advocated by the FWS. DOC's focusing on the

---

7. The study states: "The New York Department of Environmental Conservation reviewed noncancer toxicity data for dioxins for piscivorous mammals and birds and arrived at a dietary criterion for consumption of fish. They determined that wildlife feeding primarily on fish with 2,3,7,8–TCDD body burden concentrations of greater than 3 ppt were at risk." 13–33.

FWS' high recommendation of the concentration of dioxin which could safely be allowed in wildlife food items, i.e., 10–12 ppt, is irrelevant given the 0.07 ppt residue level estimated to occur in food items under the 0.013 ppq water concentration set by the EPA.[8]

In a related argument, DOC also asserts that the EPA misconstrued advice it received from the FWS concerning the effect of the TMDL on bald eagle populations on the Columbia, and thus abdicated its responsibilities under the Endangered Species Act. In fact, while the FWS noted that dioxin posed a potential threat to the bald eagle, it stated that it was unknown whether bald eagles accumulated dioxin and thought that further study was necessary. *See* Letter from Russell D. Peterson (USFWS) to Robert S. Burd (Region 10) re: Section 7 Consultation for Columbia River TMDL, 2 (Nov. 21 1990). While urging the EPA to cooperate with the FWS in its ongoing study, it commended the EPA on its effort to limit dioxin discharge and recommended that the EPA "strive towards limiting NPDES permits to zero discharge of dioxins on the Columbia River Basin." *Id.*[9]

We agree with the EPA that the TMDL's effective requirement that the Mills reduce their cumulative output of dioxin by 95% is a substantial step toward achieving the FWS's recommendation that the EPA "strive … toward zero discharge." The TMDL satisfied any obligation the EPA had under the Endangered Species Act and was sufficiently protective of wildlife.

■ In sum, the EPA was required by § 1313(d)(2) to develop a TMDL for dioxin in

the context of inconclusive and diverse scientific data regarding the toxicity of dioxin. Prior to its decision, it was aware that the states' water quality standards protected aquatic life. The decision itself quotes from the states' water quality standards including language that aquatic life was to be protected. The studies referred to by Richard Albright clearly support the decision reached by the EPA, and the agency explicitly engaged in discussion with the FWS concerning the effect on wildlife, particularly bald eagles, prior to the TMDL decision. The EPA also had in its possession all public responses to the proposed TMDL dealing with this issue.

We reject DOC's claim that the EPA failed to consider the effect of the TMDL on aquatic life and wildlife, and its claim that the ambient concentration selected fails to protect animal life. We conclude that the EPA's decision is supported by substantial evidence.

### 2. The TMDL and Human Life on the Columbia

Projecting that implementation of the TMDL would result in a 0.013 ppq ambient concentration of dioxin in the Columbia Basin, the EPA calculated that this figure would result in a bioaccumulation of dioxin in the tissue of freshwater fish equal to 65 picograms per kilo, i.e., approximately 0.07 ppt.

In order to calculate the quantity of dioxin that would in turn be consumed by humans, the EPA adopted as one of the relevant variables the national average total consumption rate for all freshwater and estuarine fish

---

**8.** DOC also challenges the bioconcentration factor of 5,000 used by the EPA to estimate the average tissue concentration of dioxin in fish tissue which will be brought about by the TMDL. DOC acknowledges that the evidence in the record regarding this figure was divergent. We conclude that the EPA's determination of this bioconcentration factor was supported by sufficient evidence. *See Natural Resources Defense Council v. U.S.E.P.A.,* 16 F.3d 1395, 1403–04 (4th Cir.1993).

**9.** In a 1994 study issued by the FWS, the FWS, while pinpointing a number of concerns for further research, specifically recommends that the EPA continue to implement the current TMDL for five years. Its formal opinion stated:

It is the Service's biological opinion that establishment of a total maximum daily load of [dioxin] not to exceed a surface water concentration of 0.013 picograms per liter … is not likely to jeopardize the continued existence of the bald eagle … of the Oregon and Washington subpopulations.

USFWS Biological Opinion Letter to EPA, Biological Opinion on the Effects of the TMDL on Bald Eagles along the Columbia River at 2 (Jan. 6, 1994).

While this document was not before the EPA at the time the TMDL was established, it indicates that the EPA's decision is not at odds with current scientific evaluation of the TMDL undertaken by the FWS.

of 6.5 grams per day. *See Natural Resources*, 16 F.3d at 1395, 1403, n. 13; 45 Fed.Reg. 79,318–01 (Nov. 28, 1980). Assuming a lifetime of consumption of this amount of fish per day, and assuming that all 6.5 grams were contaminated to the highest level possible under the TMDL, the agency determined that the average risk to health would still satisfy the general one-in-a-million risk level provided for by the state water quality standards.

DOC argues, however, that the EPA failed to consider the effect of this dioxin concentration level on certain human subpopulations which consume greater quantities of fish. DOC asserts that these subpopulations would not be protected to the one-in-a-million risk level.

■ While the EPA acknowledges that continuing scientific studies may indicate that subpopulations are not adequately protected by the TMDL, it states that its conclusion that the TMDL was adequately protective of human health was not at the time arbitrary and capricious. The EPA offers a variety of justifications for its decision:

First, the EPA notes that the "potency factor" it adopted for dioxin was the most stringent in the world. Potency factors for dioxin used by other agencies or foreign governments would have resulted in numerical values between five and sixteen hundred times less stringent.

Second, the EPA argues that it reasonably concluded that higher consumption of fish among subpopulations did not imply that the total quantity of fish consumed would be maximally contaminated. The EPA notes that no definitive study had established the quantity and variety of *contaminated* fish consumed by these subpopulations. Since much of the fish population in the Columbia Basin consists of anadromous fish, *e.g.*, salmon and steelhead trout, which spend only limited time in contaminated river waters, the EPA argues that it was reasonable to assume that not all the fish tissue consumed by the subpopulations would be contaminated. Further, even if the fish were contaminated, they would not necessarily be contaminated at the highest concentrations possible.

As a result of these uncertainties, the EPA estimated that the total consumption of 150 grams of fish by these subpopulations would lead to no greater dioxin ingestion than would occur by consuming 6.5 grams of fully contaminated fish. On this assumption the subpopulations would be adequately protected. *See Natural Resources*, 16 F.3d at 1402.

In addition, the EPA argues that even assuming consumption of 150 grams of fully contaminated fish, as claimed by DOC, the risk level would still be only 23 in a million. This level of risk protection is within levels historically approved by the EPA and upheld by courts. *See Ohio v. EPA*, 997 F.2d 1520, 1533 (D.C.Cir.1993). The EPA argues that the one-in-a-million risk level mandated by the state water quality standards for the general population does not necessarily reflect state legislative intent to provide the highest level of protection for *all* subpopulations but could reasonably be construed to allow for lower yet adequate protection of specific subpopulations.

We hold that the EPA's decision to adopt a 0.013 ppq ambient dioxin concentration cannot be considered arbitrary and capricious with regard to the effect of dioxin on human subpopulations, nor was the decision based on an unreasonable interpretation of state water quality standards.

*3. The TMDL and Dioxin–Related Compounds*

DOC argues that limiting the amount of dioxin without consideration of the presence of other chemicals in the water which act in a similar fashion fails to achieve the level of safety mandated by the water quality standards of the states.

■ Nothing in the Clean Water Act requires TMDLs to be issued for all pollutants at once. In fact, regulations pertaining to TMDL implementation specifically provide that TMDLs may be developed on a specific pollutant basis, 40 C.F.R. § 130.7(c)(1)(ii), and the states bordering the Columbia River had decided to proceed on environmental

cleanup according to a chemical-by-chemical priority.[10]

■ The EPA decision was supported by its own studies which indicated that dioxin was the most toxic of these compounds. The EPA reasonably concluded that expeditious limitation of TCDD would greatly reduce the general toxic risk posed by the presence of the other related pollutants. This view is supported by the fact that dioxin had been explicitly singled out by Congress as appropriate for individual control strategies under 33 U.S.C. § 1314($l$)(1)(D). Furthermore, information regarding the ability of other compounds to bioconcentrate to toxic levels was not as available as was information on dioxin.

### C. Conclusion

The Supreme Court has observed, "[a]s we have often recognized, an agency ruling is 'arbitrary and capricious if the agency has ... entirely failed to consider an important aspect of the problem.'" *Arkansas v. Oklahoma,* 503 U.S. 91, 113, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992) (citation omitted). We hold that the EPA's decision to establish the dioxin TMDL at 0.013 ppq was within reasonable limits of its discretionary authority and reflected an adequate consideration of the facts. We have previously held,

> an agency must articulate a satisfactory explanation for its action. There must be a rational connection between the facts found and the choices made. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). The agency's explanation must be sufficient to permit effective judicial review, *see S.E.C. v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1947), and the reviewing court should not attempt to make up for deficiencies in the agency's decision. *Motor Vehicle Manufacturers,* 463 U.S. at 43, 103 S.Ct. at 2866–67. A

court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* However, a court can uphold an agency decision "of less than ideal clarity if the agency's path may reasonably be discerned." *Id.*

*Northwest Motorcycle Ass'n v. USDA,* 18 F.3d 1468, 1478 (9th Cir.1994).

■ None of the bases asserted by the environmental groups provide sufficient grounds for overturning the EPA's decision as arbitrary or capricious. It appears that the EPA consistently took a conservative approach with a reasonably wide margin for safety. As the EPA notes, the limit of dioxin which the TMDL imposes on the Mills is the lowest level of dioxin that can be measured by current technology. *See* TMDL at C1–3, Resp. to Cmts. at 2. If the EPA had chosen to set a lower level, the evidence suggests that it would have been unenforceable.

### II. Mills' Claims

#### A. Standard of Review

■ A court should accept the "reasonable" interpretation of a statute chosen by an administrative agency except when it is clearly contrary to the intent of Congress. *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782.[11] *Accord, Flaten v. Secretary of Health & Human Services,* 44 F.3d 1453, 1460 (9th Cir. 1995).

#### B. Discussion

We must determine whether the EPA's interpretation of § 1313(d)(1)(A) is unreason-

---

**10.** The EPA notes, however, that under § 1313(d)(1)(A) nothing prohibits the environmental groups from presenting their findings to the states and requesting the states to develop TMDLs for these "mixtures" of toxic pollutants on a priority basis.

**11.** The Court added in a footnote: "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* n. 11.

able or clearly contrary to the intent of Congress. Section 1313(d)(1)(A) provides:

> Each State shall identify those waters within its boundaries for which the effluent limitations required by section 1311(b)(1)(A) and section 1311(b)(1)(B) of this title are not stringent enough to implement any water quality standard applicable to such waters.[12]

### 1. The Mills' Argument

The Mills contend that the plain language of 33 U.S.C. § 1313(d)(1)(A) prohibits—prior to the application and proven ineffectiveness of less burdensome technology-based pollution controls—a body of water from being listed as "water quality limited" and from being regulated by TMDLs. The Mills assert that because no effluent limitations were developed for dioxin under § 1311(b)(1)(A) or (B), the states improperly listed, and the EPA improperly approved, such waters as water quality limited. Accordingly, neither could the states or the EPA move to the subsequent step of implementing TMDLs for those waters pursuant to § 1313(d)(1)(C) or (2).

The Mills focus particular attention on the present tense language of § 1313(d)(1)(A), i.e., "the effluent limitations of § 1311 ... are not stringent enough to implement any water quality standard applicable to such waters...." The Mills argue that the "plain language" of the provision prohibits the EPA from developing TMDLs prior to the proven failure of technology-based limitations.[13]

The Mills state that the procedure of first developing and applying technology-based limitations is mandated by the legislative history of the Clean Water Act. They claim that Congress intended that technology-based limitations be imposed prior to water-quality-based controls in a manner which "would balance the costs and the benefits of pollution control." The Mills quote EPA Administrator Douglas Costle's testimony before the House in 1977:

> [O]ur primary means for bringing toxic pollutants and wastewater dischargers under control is and will continue to be the technological and economic-based limita-

---

**12.** § 1311. Effluent Limitations

. . . .

(b) Timetable for achievement of objectives

In order to carry out the objective of this chapter there shall be achieved—

(1)(A) not later than July 1, 1977, effluent limitations for point sources, other than publicly owned treatment works, (i) which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 1314(b) of this title, or (ii) in the case of a discharge into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, which shall require compliance with any applicable pretreatment requirements and any requirements under section 1317 of this title; and

(B) for publicly owned treatment works in existence on July 1, 1977, or approved pursuant to section 1283 of this title prior to June 30, 1974 ... effluent limitations based upon secondary treatment as defined by the Administrator pursuant to section 1314(d)(1) of this title.

**13.** The Mills also point to the language of a relevant EPA regulation:

40 CFR § 130.7. Total maximum daily loads (TMDL) and individual water quality based effluent limitations.

. . . .

(b) Identification and priority setting for water quality limited segments still requiring WLAs/LAs and TMDLs.

(1) Each state shall identify those water quality limited segments still requiring WLAs/LAs and TMDLs within its boundaries for which:

(i) Technology-based effluent limitations required by sections 301(b), 306, 307, or other sections of the Act;

(ii) More stringent effluent limitations (including prohibitions) required by either State or local authority preserved by section 510 of the Act or Federal Authority (law, regulation, or treaty); and

(iii) Other pollution control requirements (e.g., best management practices), required by local, State, and Federal authority are not stringent enough to implement any water quality standard (WQS) applicable to such waters. (emphasis added by the Mills).

The Mills insist that the "still requiring" language of the regulation implies that technology-based limitations must have already been implemented and failed to achieve the necessary water quality.

Additionally, the Mills contrast the present tense language of § 1313(d)(1)(A) with language from § 1314(l), which allows the EPA to establish individual control strategies when technology-based limitations of section 1311 "cannot reasonably be anticipated to attain or maintain ... water quality standards for such waters...."

tions to effluents of wastewater discharge. Through this approach, large numbers of pollutants and pollutant sources can be regulated, an initial and often preventative level of control can be achieved and economic impacts can be kept within reasonable limits until such time as toxicity and exposure data are sufficient to justify more stringent control.

4 Sen. Comm. on Environment and Public Works, 95th Cong., 2d Sess, *A Legislative History of the Clean Water Act of 1977* at 1405 (1978).

### 2. The EPA's Interpretation of § 1313(d)

The EPA argues that "[w]e interpret section 1313(d) as requiring TMDLs where existing pollution controls will not lead to attainment of water quality standards." We take this as an assertion that when a state has listed a water as impaired by toxic pollutants, the EPA has authority to implement TMDLs for that toxic pollutant under § 1313(d) even before technological limitations have been developed and implemented pursuant to § 1311(b)(1)(A) or (B). We hold that the EPA's interpretation is reasonable and not contrary to congressional intent.

Section 1313(d)(1)(A) provides that states shall list waters as impaired when any technological limitations required by § 1311(b)(1)(A) and (B) fail to satisfy water quality standards. Section 1311(b)(1)(A) and (B), referred to in § 1313(d)(1)(A), require development of "effluent limitations for point sources ... which shall require the application of the *best practicable control technology* currently available." (Emphasis added). Section 1311(b)(1)(A) and (B) therefore require development of technology-based effluent limitations only for those point sources that are discharging pollutants subject by the Act to best practicable technology limitations ("BPT limitations"). The Act is clear, however, that *toxic* pollutants, such as dioxin, are subject, not to BPT limitations, but rather to best *available* technology limitations ("BAT limitations"). Dioxin is not a conventional pollutant but a *toxic* pollutant and is therefore not subject to BPT limitations but BAT limitations. *See* §§ 1311(b)(2), 1317.

The Mills argue:

Given that the Clean Water Act requires EPA to develop *BAT limitations* for toxic pollutants, the Mills acknowledge that a reasonable interpretation of the Act is to permit the establishment of TMDLs if BAT limitations are not stringent enough to achieve water quality standards, rather than interpreting the statute to require EPA to promulgate BPT limitations first in order to determine whether TMDLs are authorized.... Any other interpretation would inevitably lead to the conclusion the TMDLs are not authorized by toxic pollutants because BPT limitations are not established for toxic pollutants.

The Mills contend that the failure of § 1311(b)(1)(A) or (B) to require development of BPT limitations for the discharge of dioxin can only be interpreted to imply either that *BAT* limitations must first be developed and fail prior to listing the water as impaired under § 1313(d), or that TMDLs can never be issued under § 1313(d) for toxic pollutants. We agree with neither argument.

We do not construe the Act to exclude TMDLs for toxic pollutants. As authority for their conclusion, the Mills rely on dictum from our decision in *Natural Resources Defense Council v. U.S.E.P.A.*, 915 F.2d 1314 (9th Cir.1990). In a footnote, we stated:

[Section 1313(d)] ... requires states to identify only those waters for which limitations based on the best *practicable* technology would not be stringent enough to implement the water quality standards. Those waters for which limitations based on the more demanding best *available* technology—the required level of technology to control toxics—were insufficient did *not* have to be listed.

*Id.* at 1322, n. 9 (emphasis in original).

This dictum does not stand for the proposition which the Mills assert, namely, that "TMDLs are not authorized for toxic pollutants." All the dictum expressly says is that waters contaminated by toxic pollutants in spite of BAT limitations "did *not* have to be listed" under § 1313(d). This dictum says nothing as to whether such waters *may* be listed. It also leaves unresolved whether TMDLs can be implemented for toxic pollutants *absent* implementation of technology-

based limitations. In other words, our dictum in *Natural Resources* leaves unresolved the precise question raised in the present appeal.[14]

We reject the Mills' claim that, prior to implementing TMDLs, § 1313(d) of the Act requires development and proven failure of BAT limitations for *toxic pollutants.* The Mills offer no authority for this interpretation and it is not supported by the language of the statute. BPT limitations are not required by § 1313(d) for dioxin because the limitations required by the provisions of § 1311 referred to in § 1313(d) are not applicable to toxic pollutants; thus any limitations required by those provisions of § 1311, as a matter of law, "are not stringent enough" to achieve established water quality standards. Nowhere does the Act prohibit the EPA from listing waters as impaired and implementing TMDLs for toxic pollutants pursuant to § 1313(d).

■ We conclude that § 1313(d) allows the EPA to establish TMDLs for waters contaminated with toxic pollutants without prior development of BAT limitations. As the Supreme Court stated in *Arkansas v. Oklahoma,* "the Clean Water Act vests in the EPA and the States broad authority to develop long-range, area-wide programs to alleviate and eliminate existing pollution." 503 U.S. at 108, 112 S.Ct. 1046.

Further, the EPA's interpretation, which permits immediate listing of waters impaired by toxic wastes, is consistent with the excerpt from legislative history offered by the Mills. Federal and state governments should not be required to expend time-consuming effort on development and implementation of technology-based limitations when the issue is discharge of toxic pollutants. When only conventional pollutants are at issue, however, there is not the same pressing necessity to impose the burdens created by TMDLs:

> Through [technological limitations], large numbers of pollutants and pollutant sources can be regulated, an initial and often preventative level of control can be achieved and economic impacts can be kept within reasonable limits *until such time as toxicity and exposure data are sufficient to justify more stringent control.*

*See supra, A Legislative History of the Clean Water Act of 1977* at 1405 (1978) (emphasis added).

The discovery and proven biological threat of highly toxic substances being discharged into state waters provides the precise circumstance allowing for more stringent controls. Because dioxin's toxicity was sufficiently known, use of a TMDL was justified before first imposing technology-based limitations.

We hold that the EPA's establishment of a TMDL for dioxin discharge into the Columbia River Basin is consistent with a reasonable interpretation and application of § 1313(d). Having found no merit in any of the remaining arguments of the environmental groups and the mills, the district court's grant of summary judgment in favor of the EPA on appellants' claims is

AFFIRMED.

---

**14.** Footnote 9 in *Natural Resources* does, however, suggest that neither the states nor the EPA are *obligated* under § 1313(d)(1)(A) to list waters impaired by toxic pollutants despite the proven failure of BAT limitations. We note in passing that our holding in *Alaska Ctr. for the Environment v. Browner,* 20 F.3d 981 (9th Cir.1994) indicates that the states and the EPA are generally required by the Act to list waters that are impaired despite the application and proven failure of technology-based limitations required by the Act. *Id.* at 983.

This appeal, however, does not require us to determine the relation between these prior cases because it does not raise the issue of under what conditions the Act *requires* that TMDLs be developed for toxic pollutants. Rather, the question in this appeal is simply whether the EPA has the *authority* pursuant to § 1313(d) to develop TMDLs for toxic waste prior to the development of BAT limitations.

The difference between the mandatory obligations and discretionary authority of the EPA under the Clean Water Act has been clearly recognized by the Supreme Court, "Our decision not to determine at this time the scope of the Agency's statutory *obligations* does not affect our resolution ... of the Agency's statutory *authority.* Even if the Clean Water Act itself does not require [a particular compliance with state water quality standards], the statute clearly does not limit the EPA's authority to mandate such compliance." *Arkansas,* 503 U.S. at 105, 112 S.Ct. at 1056.