Justice Stevens,
with whom Justice Souter, Justice Ginsburg, and Justice Breyer join, dissenting.
These eases present a problem of conflicting “shalls.” On the one hand, § 402(b) of the Clean Water Act (CWA) provides that the Environmental Protection Agency (EPA) “shall” approve a State’s application to administer a National Pollution Discharge Elimination System (NPDES) permitting program unless it determines that nine criteria are not satisfied. 33 U. S. C. § 1342(b). On the other hand, shortly after the passage of the CWA, Congress enacted § 7(a)(2) of the Endangered Species Act of 1973 (ESA), which commands that federal agencies “shall” ensure that their actions do not jeopardize endangered species. 16 U. S. C. § 1536(a)(2).
When faced with competing statutory mandates, it is our duty to give full effect to both if at all possible. See, e. g., Morton v. Mancari, 417 U. S. 535, 551 (1974) (“[W]hen two statutes are capable of co-existence, it is the duty of the *674 courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective”). The Court fails at this task. Its opinion unsuccessfully tries to reconcile the CWA and the ESA by relying on a federal regulation, 50 CFR § 4Ó2.03 (2006), which it reads as limiting the reach of § 7(a)(2) to only discretionary federal actions, see ante, at 664-666. Not only is this reading inconsistent with the text and history of §402.03, but it is fundamentally inconsistent with the ESA itself.
In the celebrated “snail darter” case, TV A v. Hill, 437 U. S. 153 (1978), we held that the ESA “reveals a conscious decision by Congress to give endangered species priority over the ‘primary missions’ of federal agencies,” id., at 185. Consistent with that intent, Chief Justice Burger’s exceptionally thorough and admirable opinion explained that §7 “admits of no exception.” Id., at 173. Creating precisely such an exception by exempting nondiscretionary federal actions from the ESA’s coverage, the Court whittles away at Congress’ comprehensive effort to protect endangered species from the risk of extinction and fails to give the ESA its intended effect. After first giving Hill the attention it deserves, I will comment further on the irrelevance of § 402.03 to these cases and offer other available ways to give effect to both the CWA and the ESA. Having done so, I conclude by explaining why these cases should be remanded to EPA for further proceedings.
I
In Hill, we were presented with two separate questions: (1) whether the ESA required a court to enjoin the operation of the nearly completed Tellieo Dam and Reservoir Project because the Secretary of the Interior had determined that its operation would eradicate a small endangered fish known as a snail darter; and (2) whether post-1973 congressional appropriations for the completion of the Tellieo Dam constituted an implied repeal of the ESA, at least insofar as it *675 applied to the dam. Id., at 156. More than 30 pages of our opinion explain our affirmative answer to the first question, see id., at 156-188, but just over four pages sufficed to explain our negative answer to the second, see id., at 189-193. While it is our ruling on the first question that is relevant to the cases before us, it is our refusal to hold that the ESA itself had been impliedly repealed that the majority strangely deems most significant. See ante, at 670.
In answering Hill's first question, we did not discuss implied repeals. On the contrary, that portion of the opinion contained our definitive interpretation of the ESA, in which we concluded that “the language, history, and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities.” 437 U. S., at 174; see also id., at 177 (“ ‘The dominant theme pervading all Congressional discussion of the proposed [ESA] was the overriding need to devote whatever effort and resources were necessary to avoid further diminution of national and worldwide wildlife resources' ” (quoting Coggins, Conserving Wildlife Resources: An Overview of the Endangered Species Act of 1973, 51 N. D. L. Rev. 315, 321 (1975); emphasis added in Hill)). With respect to § 7 in particular, our opinion could not have been any clearer. We plainly held that it “admits of no exception.” 437 U. S., at 173 (emphasis added).[1]
Our opinion in Hill explained at length why §7 imposed obligations on “all federal agencies” to ensure that “actions authorized, funded, or carried out by them do not jeopardize the continued existence of endangered species.” 437 U. S., *676 at 173 (emphasis deleted; internal quotation marks omitted). Not a word in the opinion stated or suggested that § 7 obligations are inapplicable to mandatory agency actions that would threaten the eradication of an endangered species. Nor did the opinion describe the Tennessee Valley Authority’s (TVA) attempted completion of the Tellico Dam as a discretionary act. How could it? After all, if the Secretary of the Interior had not declared the snail darter an endangered species whose critical habitat would be destroyed by operation of the Tellico Dam, the TVA surely would have been obligated to spend the additional funds that Congress appropriated to complete the project.[2] Unconcerned with whether an agency action was mandatory or discretionary, we simply held that § 7 of the ESA
“reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species. The pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the ‘primary missions’ of federal agencies.” Id., at 185 (emphasis added).[3]
*677 The fact that we also concluded that the post-1973 congressional appropriations did not impliedly repeal the ESA provides no support for the majority’s contention that the obligations imposed by § 7(a)(2) may be limited to discretionary acts. A few passages from the relevant parts of Hill belie that suggestion. After noting the oddity of holding that the interest in protecting the survival of a relatively small number of 3-inch fish “would require the permanent halting of a virtually completed dam for which Congress has expended more than $100 million,” we found “that the explicit provisions of the [ESA] require precisely that result.” Id., at 172, 173. We then continued:
“One would be hard pressed to find a statutory provision whose terms were any plainer than those in §7 of the [ESA]. Its very words affirmatively command all federal agencies ‘to insure that actions authorized funded, or carried out by them do not jeopardize the continued existence’ of an endangered species or ‘result in the destruction or modification of habitat of such species ....’” Id., at 173 (quoting 16 U. S. C. § 1536 (1976 ed.); emphasis added in Hill).
We also reviewed the ESA’s history to identify a variety of exceptions that had been included in earlier legislation and unenacted proposals but were omitted from the final version of the 1973 statute. We explained that earlier endangered species legislation “qualified the obligation of federal agencies,” but the 1973 Act purposefully omitted “all phrases which might have qualified an agency’s responsibilities.” 437 U. S., at 181, 182. Moreover, after observing that the *678 ESA creates only a limited number of “hardship exemptions,” see 16 U. S. C. § 1539 — none of which would apply to federal agencies — we applied the maxim expressio unius est exclusio alterius to conclude that “there are no exemptions in the [ESA] for federal agencies,” 437 U. S., at 188.
Today, however, the Court countenances such an exemption. It erroneously concludes that the ESA contains an unmentioned exception for nondiscretionary agency action and that the statute’s command to enjoin the completion of the Tellico Dam depended on the unmentioned fact that the TVA was attempting to perform a discretionary act. But both the text of the ESA and our opinion in Hill compel the contrary determination that Congress intended the ESA to apply to “all federal agencies” and to all “actions authorized, funded, or carried out by them.” Id., at 173 (emphasis deleted).
A transfer of NPDES permitting authority under § 402(b) of the CWA is undoubtedly one of those “actions” that is “authorized” or “carried out” by a federal agency. See 16 U. S. C. § 1536(b); 50 CFR § 402.02 (defining “action” as “all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to . . . actions directly or indirectly causing modifications to the land, water, or air”). It follows from Hill that § 7(a)(2) applies to such NPDES transfers— whether they are mandatory or discretionary.
II
Given our unequivocal holding in Hill that the ESA has “first priority” over all other federal action, 437 U. S., at 185, if any statute should yield, it should be the CWA. But no statute must yield unless it is truly incapable of coexistence. See, e. g., Morton, 417 U. S., at 551. Therefore,' assuming that § 402(b) of the CWA contains its own mandatory com *679 mand, we should first try to harmonize that provision with the mandatory requirements of § 7(a)(2) of the ESA.
The Court’s solution is to rely on 50 CFR §402.03, which states that “Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control.” The Court explains that this regulation “harmonizes the statutes by giving effect to the ESA’s no-jeopardy mandate whenever an agency has discretion to do so, but by lifting that mandate when the agency is prohibited from considering such extrastatutory factors.” Ante, at 665. This is not harmony, and it certainly is not effect. Rather than giving genuine effect to § 7(a)(2), the Court permits a wholesale limitation on the reach of the ESA. Its interpretation of §402.03 conflicts with the text and history of the regulation, as well as our interpretation of § 7 in the “snail darter” case.
To begin with, the plain language of §402.03 does not state that its coverage is limited to discretionary actions. Quite the opposite, the most natural reading of the text is that it confirms the broad construction of § 7 endorsed by our opinion in Hill. Indeed, the only way to read § 402.03 in accordance with the facts of the case and our holding that § 7 “admits of no exception[s],” 437 U. S., at 173, is that it eliminates any possible argument that the ESA does not extend to situations in which the discretionary federal involvement is only marginal.
The Court is simply mistaken when it says that it reads §402.03 “to mean what it says: that §7(a)(2)’s no-jeopardy duty covers only discretionary agency actions ....” Ante, at 669 (emphasis added). That is not, in fact, what §402.03 “says.” The word “only” is the Court’s addition to the text, not the Agency’s. Moreover, that text surely does not go on to say (as the Court does) that the duty “does not attach to actions (like the NPDES permitting transfer authorization) that an agency is required by statute to undertake once cer *680 tain specified triggering events have occurred.” Ibid. If the drafters of the regulation had intended such a far-reaching change in the law, surely they would have said so by using language similar to that which the Court uses today.
Nothing in the proceedings that led to the promulgation of the regulation suggests any reason for limiting the preexisting understanding of the scope of § 7’s coverage. EPA codified the current version of §402.03 in 1986 as part of a general redrafting of ESA regulations. In the 1983 Notice of Proposed Rulemaking, the proposed version of §402.03 stated that “§ 7 and the requirements of this Part apply to all actions in which there is Federal involvement or control.” 48 Fed. Reg. 29999 (1983). Without any explanation, the final rule inserted the word “discretionary” before “Federal involvement or control.” 51 Fed. Reg. 19958 (1986).[4] Clearly, if the Secretary of the Interior meant to limit the pre-existing understanding of the scope of the coverage of § 7(a)(2) by promulgating this regulation, that intent would have been mentioned somewhere in the text of the regulations or in contemporaneous comment about them. See National Cable & Telecommunications Assn. v. Brand X Internet Services, 545 U. S. 967, 1001 (2005) (holding that an agency is free within “the limits of reasoned interpretation to change course” only if it “adequately justifies the change”); Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U. S. 29, 48 (1983) (“We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner”). Yet, the final rule said nothing about limiting the reach of *681 §7 or our decision in Hill. Nor did it mention the change from the notice of proposed rulemaking. I can only assume, then, that the regulation does mean what both it and the notice of proposed rulemaking says: Section 7(a)(2) applies to discretionary federal action, but not only to discretionary action.
The only explanation the Agency provided for §402.03 was the following:
“This section, which explains the applicability of section 7, implicitly covers Federal activities within the territorial jurisdiction of the United States and upon the high seas as a result of the definition of ‘action’ in § 402.02. The explanation for the scope of the term ‘action’ is provided in the discussion under §402.01 above.” 51 Fed. Reg. 19937.
This statement directs us to two sources: the definition of “action” in §402.02 and the “explanation for the scope of the term ‘action’” in §402.01. 51 Fed. Reg. 19937. Both confirm that there was no intent to draw a distinction between discretionary and nondiscretionary actions.
Section 402.02 provides in relevant part:
“Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:
“(a) actions intended to conserve listed species or their habitat;
“(b) the promulgation of regulations . . . .” (Second and third emphases added.)
Actions in either of the described subcategories are sometimes mandatory and sometimes discretionary. Likewise, as the italicized portions indicate, the term “action” expressly refers to “all” agency activities or programs “of any kind,” regardless of whether they are discretionary or mandatory. By reading the term “discretionary” as a limitation on “ac *682 tion,” the Court creates a contradiction in EPA’s own regulation.[5]
As for the final rule’s explanation for the scope of the term “action” in §402.01, that too is fully consistent with my interpretation of §402.03. That explanation plainly states that “all Federal actions including ‘conservations programs’ are subject to the consultation requirements of section 7(a)(2) if they ‘may affect’ listed species or their critical habitats.” 51 Fed. Reg. 19929 (emphasis added). The regulation does not say all “discretionary” federal actions, nor does it evince an intent to limit the scope of § 7(a)(2) in any way. Rather, it just restates that the ESA applies to “all” federal actions, just as the notice of proposed rulemaking did. This explanation of the scope of the word “action” is therefore a strong indication that the Court’s reading of “discretionary” is contrary to its intended meaning.
An even stronger indication is the fact that at no point in the administrative proceedings in these cases did EPA even mention it.[6] As an initial matter, it is worth emphasizing *683 that even if EPA had relied on § 402.03, its interpretation of the ESA would not be entitled to deference under Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837 (1984), because it is not charged with administering that statute, id., at 844 (“We have long recognized that considerable weight should be accorded to an executive department’s construction of a statutory scheme it is entrusted to administer” (emphasis added)); Department of Treasury v. FLRA, 837 F. 2d 1163, 1167 (CADC 1988) (“[W]hen an agency interprets a statute other than that which it has been entrusted to administer, its interpretation is not entitled to deference”). The Departments of the Interior and Commerce, not EPA, are charged with administering the ESA. See Babbitt v. Sweet Home Chapter, Communities for Great Ore., 515 U. S. 687, 703-704 (1995). And EPA has conceded that the Department of the Interior’s biological opinion “did not discuss 50 C. F. R. 402.03, and it did not address the question whether the consultation that produced the [biological opinion] was required by the ESA.” Pet. for Cert. in No. 06-549, p. 24; see App. 77-124 (never mentioning § 402.03). Left with this unfavorable administrative record, EPA can only lean on the fact that the Department of the Interior has recently “clarified” its position regarding §402.03 in a different administrative proceeding. See Pet. for Cert. in No. 06-549, at 24-25; id., at 26 (“The recent F[ish and Wildlife Service (FWS)] and N[ational Marine Fisheries Service] communications regarding Alaska’s pending transfer application reflect those agencies’ considered interpretations ... of [50 CFR §] 402.03”); App. to Pet. for Cert. in No. 06-340, pp. 103-116; see also ante, at 660, n. 5. We have long held, however, that courts may not affirm an agency action on grounds other than those adopted by the agency in *684 the administrative proceedings. See SEC v. Chenery Corp., 318 U. S. 80, 87 (1943). The majority ignores this hoary principle of administrative law and substitutes a post hoc interpretation of § 7(a)(2) and §402.03 for that of the relevant agency. For that reason alone, these cases should be remanded to the Agency. And for the other reasons I have given, §402.03 cannot be used to harmonize the CWA and the ESA.
Ill
There are at least two ways in which the CWA and the ESA can be given full effect without privileging one statute over the other.
A
The text of § 7(a)(2) itself provides the first possible way of reconciling that provision with § 402(b) of the CWA. The subsection reads:
“Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an ‘agency action’) is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which.is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section.” 16 U. S. C. § 1536(a)(2) (emphasis added).
The Court is certainly correct that the use of the word “shall” in § 7(a)(2) imposes a mandatory requirement on the federal agencies. See ante, at 662. It is also correct that the ESA’s “mandate is to be carried out through consultation and may require the agency to adopt an alternative course of action.” Ibid. The Court is too quick to conclude, however, *685 that this consultation requirement creates an irreconcilable conflict between this provision and § 402(b) of the CWA. It rushes to this flawed judgment because of a basic conceptual error — an error that is revealed as early as the first paragraph of its opinion. Rather than attempting to find a way to give effect to §7(a)(2)’s consultation requirement, the Court frames the question presented as “whether § 7(a)(2) effectively operates as a tenth criterion on which the transfer of permitting power under the first statute must be conditioned. ” Ante, at 649. The Court is not alone in this. The author of the Ninth Circuit opinion below also stated that the ESA “adds one requirement to the list of considerations under the Clean Water Act permitting transfer provision.” 450 F. 3d 394,404, n. 2 (2006) (Berzon, J., concurring in denial of rehearing en banc) (emphasis in original). But while the ESA does mandate that the relevant agencies “eonsul[t]” with the Interior Department, that consultation process also provides a way for the agencies to give effect to both statutes.
The first step in the statutory consultation process is to identify whether any endangered species will be affected by an agency action. An agency proposing a particular action, such as an NPDES transfer, will typically ask the Secretary of the Interior whether any listed species may be present in the area of the proposed action and whether that action will “affect” those species. See 16 U. S. C. § 1536(c). It is entirely possible that no listed species will be affected, and any anticipated conflict between the ESA and another statute will have been avoided at this threshold stage. If, however, the Secretary determines that a proposed action may affect an endangered species or its critical habitat, the agency must formally consult with the Secretary. This consultation culminates in the issuance of a “biological opinion,” which “detail[s] how the agency action affects the species or its critical habitat.” § 1536(b)(3)(A); see also 50 CFR § 402.14(h). Even at this stage, it is still possible that formal consultation *686 will reveal that the agency action will not jeopardize any species. See, e.g., 63 Fed. Reg. 51198 (1998) (noting that FWS rendered a “ ‘no jeopardy’ ” finding with respect to the transfer of permitting authority to Texas).
If the biological opinion concludes that the agency action would put a listed species in jeopardy, however, the ESA contains a process for resolving the competing demands of agency action and species protection. The ESA provides that “the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action.” 16 U. S. C. § 1536(b)(3)(A); see also 50 CFR § 402.14(h)(3). EPA’s regulations define “Reasonable and prudent alternatives” as
“alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency’s legal authority and jurisdiction, that is economically and technologically feasible, and that the Director [of FWS] believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.” § 402.02.
Thus, in the face of any conflict between the ESA and another federal statute, the ESA and its implementing regulations encourage federal agencies to work out a reasonable alternative that would let the proposed action move forward “consistent with [its] intended purpose” and the agency’s “legal authority,” while also avoiding any violation of § 7(a)(2).
When applied to the NPDES transfer program, the “reasonable and prudent alternatives” process would enable EPA and the Department of the Interior to develop a substitute that would allow a transfer of permitting authority and would not jeopardize endangered species. Stated differ *687 ently, the consultation process would generate an alternative course of action whereby the transfer could still take place— as required by § 402(b) of the CWA — but in such a way that would honor the mandatory requirements of § 7(a)(2) of the ESA. This should come as no surprise to EPA, as it has engaged in pretransfer consultations at least six times in the past and has stated that it is not barred from doing so by the CWA.[7]
Finally, for the rare case in which no “reasonable and prudent alternative” can be found, Congress has provided yet another mechanism for resolving any conflicts between the ESA and a proposed agency action. In 1978, shortly after our decision in Hill, Congress amended the ESA to create the “Endangered Species Committee,” which it authorized to grant exemptions from § 7(a)(2). 16 U. S. C. § 1536(e). Because it has the authority to approve the extinction of an endangered species, the Endangered Species Committee is colloquially described as the “God Squad” or “God Committee.” In light of this weighty responsibility, Congress carefully laid out requirements for the God Committee’s membership,[8] procedures,[9] and the factors it must consider in deciding whether to grant an exemption.[10]
*688 As the final arbiter in situations in which the ESA conflicts with a proposed agency action, the God Committee embodies the primacy of the ESA’s mandate and serves as the final mechanism for harmonizing that Act with other federal statutes. By creating this Committee, Congress recognized that some conflicts with the ESA may not be capable of resolution without having to forever sacrifice some endangered species. At the same time, the creation of this last line of defense reflects Congress’ view that the ESA should not yield to another federal action except as a final resort and exeept when authorized by high-level officials after serious consideration. In short, when all else has failed and two federal statutes are incapable of resolution, Congress left the choice to the Committee — not to this Court; it did not limit. the ESA in the way the majority does today.
B
EPA’s regulations offer a second way to harmonize the CWA with the ESA. After EPA has transferred NPDES permitting authority to a State, the Agency continues to *689 oversee the State’s permitting program. See Arkansas v. Oklahoma, 503 U. S. 91, 105 (1992) (“Congress preserved for the Administrator broad authority to oversee state permit programs”). If a state permit is “outside the guidelines and the requirements” of the CWA, EPA may object to it and block its issuance. See 33 U. S. C. § 1342(d)(2); 66 Fed. Reg. 11206 (2001). Given these ongoing responsibilities, EPA has. enacted a regulation that requires a State to enter into a Memorandum of Agreement (MOA) that sets forth the particulars of the Agency’s oversight duties. See 40 CFR § 123.24(a) (2006).
The regulation governing MOAs contains several detailed requirements. For instance, the regulation states that an MOA must contain “[provisions specifying classes and categories of permit applications, draft permits and proposed permits that the State will send to the [EPA] Regional Administrator for review, comment and, where applicable, objection,” § 123.24(b)(2); “[provisions specifying the frequency and content of reports, documents and other information which the State is required to submit to the EPA,” 1123.24(b)(3); and “[provisions for coordination of compliance monitoring activities by the State and by EPA,” § 123.24(b)(4)(i). More generally, the regulation provides that an MOA “may include other terms, conditions, or agreements” that are “relevant to the administration and enforcement of the State’s regulatory program.” § 123.24(a). Under the MOA regulation, furthermore, EPA will not approve any MOA that restricts its statutory oversight responsibility. Ibid.
Like the § 7(a)(2) consultation process described above, MOAs provide a potential mechanism for giving effect to § 7 of the ESA while also allowing the transfer of permitting authority to a State. It is important to remember that EPA must approve an MOA prior to the transfer of NPDES authority. As such, EPA can use — and in fact has used — the MOA process to structure its later oversight in a way that *690 will allow it to protect endangered species in accordance with § 7(a)(2) of the ESA. EPA might negotiate a provision in the MOA that would require a State to abide by the ESA requirements when issuing pollution permits. See Brief for American Fisheries Society et al. as Amici Curiae 28 (“In the Maine MOA, for example, EPA and the state agree that state permits would protect ESA-listed species by ensuring compliance with state water quality standards”). Alternatively, “EPA could require the state to provide copies of draft permits for discharges in particularly sensitive habitats such as those of ESA-listed species or for discharges that contain a pollutant that threatens ESA-listed wildlife.” Id., at 10. Or the MOA might be drafted in a way that would allow the agency to object to state permits that would jeopardize any and all endangered species. See id., at 28 (explaining that the Maine MOA includes a provision allowing EPA to “object to any state permit that risks harm to a listed species by threatening water quality”). These are just three of many possibilities. I need not identify other ways EPA could use the MOA process to comply with the ESA; it is enough to observe that MOAs provide a straightforward way to give the ESA its full effect without restricting § 7(a)(2) in the way the Court does.
IV
As discussed above, I believe that the Court incorrectly restricts the reach of § 7(a)(2) to discretionary federal actions. See Part II, supra. Even if such a limitation were permissible, however, it is clear that EPA’s authority to transfer permitting authority under § 402(b) is discretionary.[11]
The EPA Administrator’s authority to approve state permit programs pursuant to § 402(b) of the CWA does not even fit within the Court’s description of the category of manda *691 tory actions that the Court holds are covered by the ESA. In the Court’s words, that category includes actions “that an agency is required by statute to undertake once certain specified triggering events have occurred.” Ante, at 669. The “triggering event” for EPA’s approval is simply the filing of a satisfactory description of the State’s proposed program. See 33 U. S. C. § 1342(b). The statute then commands that the EPA Administrator “shall approve” the submitted program unless he determines that state law does not satisfy nine specified conditions. Those conditions are not “triggering events”; they are potential objections to the exercise of the Administrator’s authority.
What is more, § 402(b) is a perfect example of why our analysis should not end simply because a statute uses the word “shall.” Instead, we must look more closely at its listed criteria to determine whether they allow for discretion, despite the use of “shall.” After all, as then-Justice Rehnquist’s dissenting opinion in the “snail darter” case explains, a federal statute using the word “shall” will sometimes allow room for discretion. See Hill, 437 U. S., at 211-212.[12] In these cases, there is significant room for discretion in EPA’s evaluation of §402(b)’s nine conditions. The first criterion, for example, requires the EPA Administrator to examine five other statutes and ensure that the State has adequate authority to comply with each. 33 U. S. C. § 1342(b)(1)(A). One of those five statutes, in turn, expressly directs the Administrator to exercise his “judgment.” § 1312. Even the Court acknowledges that EPA must exer *692 cise “some judgment in determining whether a State has demonstrated that it has the authority to carry out § 402(b)’s enumerated statutory criteria.” Ante, at 671. However, in the very same breath, the Court states that the dispositive fact is that “the statute clearly does not grant it the discretion to add another entirely separate prerequisite to that list.” Ibid. This reasoning flouts the Court’s own logic. Under the Court’s reading of §402.03, § 7(a)(2) applies to discretionary federal actions of any kind. The Court plainly acknowledges that EPA exercises discretion when deciding whether to transfer permitting authority to a State. If we are to take the Court’s approach seriously, once any discretion has been identified — as it has here — § 7(a)(2) must apply.[13]
*693 The MOA regulation described in Part III-B, supra, also demonstrates that an NPDES transfer is not as ministerial a task as the Court would suggest. The Agency retains significant discretion under §123.24 over the content of an MOA, which of course must be approved prior to a transfer. For instance, EPA may require a State to file reports on a weekly basis or a monthly basis. It may require a State to submit only certain classes and categories of permit applications. And it may include any additional terms and conditions that are relevant to the enforcement of the NPDES program. There is ample room for judgment in all of these areas, and EPA has exercised such judgment in the past when approving MOAs from many States. See, e. g., Approval of Application by Maine to Administer the NPDES Program, 66 Fed. Reg. 12791 (2001); Approval of Application to Administer the NPDES Program; Texas, 63 Fed. Reg. 61164 (1998).
In fact, in an earlier case raising a question similar to this one, see American Forest & Paper Assn. v. EPA, 137 F. 3d 291, 298-299 (CA5 1998), EPA itself explained how 40 CFR § 123.24 gives it discretion over the approval of a state pollution control program, see Brief for EPA in No. 96-60874 (CA5). Arguing that “[ijndicia of discretionary involvement or control abound in [its] regulations,” the Agency listed *694 its MOA regulation as a prime example.[14] Again, because EPA’s approval of a state application to administer an NPDES program entails significant — indeed, abounding— discretion, I would find that § 7(a)(2) of the ESA applies even under the Court's own flawed theory of these cases.
V
Mindful that judges must always remain faithful to the intent of the legislature, Chief Justice Burger closed his opinion in the “snail darter” case with a reminder that “[o]nce the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end.” Hill, 437 U. S., at 194. This Court offered a definitive interpretation of the ESA nearly 30 years ago in that very case. Today the Court turns its back on our decision in Hill and places a great number of endangered species in jeopardy, including the cactus ferruginous pygmy-owl and Pima pineapple cactus at issue here. At the risk of plagiarizing Chief Justice Burger’s fine opinion, I think it is appropriate to end my opinion just as he did — with a quotation attributed to Sir Thomas More that has as much relevance today as it did three decades ago. This quotation illustrates not only the fundamental character of the rule of law embodied in § 7 of the ESA but also the pernicious consequences of official disobedience of such a rule. Repetition of that literary allusion is especially appropriate today:
“The law, Roper, the law. I know what’s legal, not what’s right. And I’ll stick to what’s legal.. .. I’m not God. The currents and eddies of right and wrong, *695 which you find such plain-sailing, I can’t navigate, I’m no voyager. But in the thickets of the law, oh there I’m a forester. . . . What would you do? Cut a great road through the law to get after the Devil? . . . And when the last law was down, and the Devil turned round on you — where would you hide, Roper, the laws all being flat? . . . This country's planted thick with laws from coast to coast — Man’s laws, not God’s — and if you cut them down . . . d’you really think you could stand upright in the winds that would blow then? . . . Yes, I’d give the Devil benefit of law, for my own safety’s sake.” R. Bolt, A Man for All Seasons, Act I, p. 147 (Three Plays, Heinemann ed. 1967) (quoted in Hill, 437 U. S., at 195).
Although its reasons have shifted over time, at both the administrative level and in the federal courts, EPA has insisted that the requirements of § 7(a)(2) of the ESA do not apply to its decision to transfer permitting authority under § 402(b) of the CWA. See App. 114; Brief for Petitioner EPA 16, 42. As I have explained above, that conclusion is contrary to the text of § 7(a)(2), our decision in TVA v. Hill, and the regulation on which the Agency has since relied and upon which the Court relies today. Accordingly, I would hold that EPA’s decision was arbitrary and capricious under the Administrative Procedure Act, see 5 U. S. C. § 706(2)(A), and would remand to the Agency for further proceedings consistent with this opinion.
I respectfully dissent.
APPENDIX
33 U.S.C.§ 1342(b)
“(b) State permit programs
“At any time after the promulgation of the guidelines required by subsection (i)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit *696 program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each submitted program unless he determines that adequate authority does not exist:
“(1) To issue permits which—
“(A) apply, and insure compliance with, any applicable requirements of sections 1311, 1312, 1316, 1317, and 1343 of this title;
“(B) are for fixed terms not exceeding five years; and
“(C) can be terminated or modified for cause including, but not limited to, the following:
“(i) violation of any condition of the permit;
“(ii) obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;
“(iii) change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;
“(D) control the disposal of pollutants into wells;
“(2)(A) To issue permits which apply, and insure compliance with, all applicable requirements of section 1318 of this title; or
“(B) To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title;
“(3) To insure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application;
*697 “(4) To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;
“(5) To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;
“(6) To insure that no permit will be issued if, in the judgment of the Secretary of the Army acting through the Chief of Engineers, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby;
“(7) To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement;
“(8) To insure that any permit for a discharge from a publicly owned treatment works includes conditions to require the identification in terms of character and volume of pollutants of any significant source introducing pollutants subject to pretreatment standards under section 1317(b) of this title into such works and a program to assure compliance with such pretreatment standards by each such source, in addition to adequate notice to the permitting agency of (A) new introductions into such works of pollutants from any source which would be a new source as defined in section 1316 of this title if such source were discharging pollutants, (B) new introductions of pollutants into such works from a source which would be subject to section 1311 of this title if it were discharging such pollutants, or (C) a substantial change in volume or character of pollutants being introduced into such works by a source introducing pollutants into such works at *698 the time of issuance of the permit. Such notice shall include information on the quality and quantity of effluent to be introduced into such treatment works and any anticipated impact of such change in the quantity or quality of effluent to be discharged from such publicly owned treatment works; and
“(9) To insure that any industrial user of any publicly owned treatment works will comply with sections 1284(b), 1317, and 1318 of this title.”

 See also Babbitt v. Sweet Home Chapter, Communities for Great Ore., 515 U. S. 687, 692 (1995) (“Section 7 requires federal agencies to ensure that none of their activities, including the granting of licenses and permits, will jeopardize the continued existence of endangered species ‘or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . : to be critical”’ (emphasis added)).

 The Court misreads this sentence and, in so doing, overreads our decision in Hill. The Court maintains that Hill held that the “[a]cts appropriating funds to the TVA ... did not require the agency to use any of the generally appropriated funds to complete the Tellico Dam project.” Ante, at 671, n. 9. But Hill said no such thing. That case only held that the subsequent appropriation of funds for the Tellico Dam Project could not overcome the mandatory requirements of § 7 of the ESA; it did not hold that the TVA would not have been required to spend any and all appropriated funds if the ESA had never been passed. See Hill, 437 U. S., at 189-190. If the ESA had never been enacted and did not stand in the way of the completion of the Tellico Dam, there is no doubt that the TVA would have finished the project that Congress had funded.

 The road not taken in Hill also helps to clarify our interpretation that § 7 was not limited to discretionary agency action. Throughout the course of the litigation, the TVA insisted that § 7 did not refer to “all the actions that an agency can ever take.” Brief for Petitioner in Tennessee Valley *677 Authority v. Hill, O. T. 1977, No. 76-1701, p. 26. Instead, the TVA sought to restrict § 7 to only those actions for “which the agency has reasonable decision-making alternatives before it.” Ibid. We rejected that narrow interpretation, stating that the only way to sustain the TVA’s position would be to “ignore the ordinary meaning of plain language.” Hill, 437 U. S., at 173.

 See also Kilbourne, The Endangered Species Act Under the Microscope: A Closeup Look From A Litigator’s Perspective, 21 Env. L. 499, 529 (1991) (noting that the Agency did not explain the addition of the word “discretionary”); Weller, Limiting the Scope of the Endangered Species Act: Discretionary Federal Involvement or Control Under Section 402.03, 5 Hastings W.-Nw. J. Env, L. & Pol’y 309, 311, 334 (Spring 1999) (same).

 Petitioner National Association of Home Builders (NAHB) points to the following language from the final rule as an indication that §7 only applies to discretionary action: “‘[A] Federal agency’s responsibility under section 7(a)(2) permeates the full range of discretionary authority held by that agency.’ ” Brief for Petitioners NAHB et al. 32 (quoting 51 Fed. Reg. 19937). However, that language is found in a different section of the final rule — the section describing the definition of “‘[r]easonable and prudent alternatives’” under 50 CFR §402.02. When put in its proper context, the cited language simply indicates that any “reasonable and prudent alternative” may involve the “maximum exercise of Federal agency authority when to do so is necessary, in the opinion of the Service, to avoid jeopardy.” 51 Fed. Reg. 19937. If that is not enough, the quoted text supports my reading of §402.03 even on NAHB’s reading. By indicating that an agency’s § 7(a)(2) responsibility “permeates the full range” of its discretionary authority, EPA confirmed that the ESA covers all discretionary actions. Ibid.

 EPA also did not rely on §402.03 in the Court of Appeals. See 420 F. 3d 946, 968 (CA9 2005) (“EPA makes no argument that its transfer decision was not a ‘discretionary’ one within the meaning of 50 CFR *683 §402.03. ... We may not affirm the EPA’s transfer decision on grounds not relied upon by the agency.... As the EPA evidently does not regard §402.03 as excluding the transfer decision, we should not so interpret the regulations”).

 See, e. g., 68 Fed. Reg. 51198 (1998) (approving Texas’ application to administer the NPDES program after consultation with FWS and stating that “EPA believes that section 7 does apply” to EPA’s action); 61 Fed. Reg. 65053 (1996) (approving Oklahoma’s NPDES application after consultation with FWS and stating that “EPA’s approval of the State permitting program under section 402 of the Clear Water Act is a federal action subject to [§7’s consultation] requirement”); see also Tr. of Oral Arg. 5 (conceding that EPA conducted six pretransfer consultations in the past).

 The Endangered Species Committee is composed of six high-ranking federal officials and a representative from each affected State appointed by the President. See 16 U. S. C. § 1536(e)(3).

 See §§1536(e)(l).

 Section 1536(h)(1) provides:
“The Committee shall grant an exemption from the requirements of subsection (a)(2) of this section for an agency action if, by a vote of not less than five of its members voting in person—
*688 “(A) it determines on the record, based on the report of the Secretary, the record of the hearing held under subsection (g)(4) and on such other testimony or evidence as it may receive, that—
“(i) there are no reasonable and prudent alternatives to the agency action;
“(ii) the benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest;
“(iii) the action is of regional or national significance; and
“(iv) neither the Federal agency concerned nor the exemption applicant made any irreversible or irretrievable commitment of resources prohibited by subsection (d) of this section; and
“(B) it establishes such reasonable mitigation and enhancement measures, including, but not limited to, live propagation, transplantation, and habitat acquisition and improvement, as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned.”

 Because it is quite lengthy, I indude the ftill text of § 402(b) in an appendix to this dissent.

 See Gutierrez de Martinez v. Lamagno, 515 U. S. 417, 432-433, n. 9 (1995) (“Though ‘shall’ generally means ‘must,’ legal writers sometimes use, or misuse, ‘shall’ to mean ‘should,’ ‘will,’ or even ‘may.’ See D. Mellinkoff, Mellinkoff’s Dictionary of American Legal Usage 402-403 (1992) (‘shall’ and ‘may’ are ‘frequently treated as synonyms’ and their meaning depends on context); B. Garner, Dictionary of Modern Legal Usage 939 (2d ed. 1995) (‘Courts in virtually every English-speaking jurisdiction have held — by necessity — that shall means may in some contexts, and vice versa’)”).

 The Court also claims that the “basic principle announced in” Department of Transportation v. Public Citizen, 541 U. S. 752 (2004) — “that an agency cannot be considered the legal ‘cause’ of an action- that it has no statutory discretion not to take” — supports its reliance on §402.03. Ante, at 667-668. First of all, the Court itself recognizes that it must distance itself from that case, ante, at 667, because Public Citizen dealt with a procedural requirement under the National Environmental Policy Act (NEPA), not a substantive requirement like that imposed by § 7(a)(2) of the ESA, see TVA v. Hill, 437 U. S. 153, 188, n. 34 (1978) (holding that NEPA cases are “completely inapposite” to the ESA context). What the Court does not recognize, however, is that what it views as the “basic principle” of Public Citizen is stated too broadly and therefore inapplicable to these cases. Ante, at 667-668.
Our decision in Public Citizen turned on what we called “a critical feature of the case”: that the Federal Motor Carrier Safety Administration (FMCSA) had “no ability to countermand” the President’s lifting a moratorium that prohibited certain motor carriers from obtaining authority to operate within the United States. 541 U. S., at 766. Once the President decided to lift that moratorium, and once the relevant vehicles had entered the United States, FMCSA was required by statute to register the vehicles if certain conditions were met. Ibid. (“Under FMCSA’s entirely reasonable reading of this provision, it must certify any motor carrier that can show that it is willing and able to comply with the various substantive requirements for safety and financial responsibility contained in Depart *693 ment of Transportation regulations; only the moratorium prevented it from doing so for Mexican motor carriers before 2001” (emphasis deleted)). Therefore, any potential NEPA concerns were generated by another decisionmaker, the President, and not FMCSA. Here, by contrast, EPA is not required to act ministerially once another person or agency has made a decision. Instead, EPA must exercise its own judgment when considering the transfer of NPDES authority to a State; it also has its own authority to deny such a transfer. Any effect on endangered species will be caused, even if indirectly, by the Agency’s own decision to transfer NPDES authority. Cf. 50 CFR § 402.02(d) (providing that the ESA will apply to all agency activities that “directly or indirectly caus[e] modifications to the land, water, or air” (emphasis added)).

 EPA also discussed several other regulations that give it discretion. For example, under 40 CFR § 123.61(b), EPA is required to solicit public comments on a State’s transfer application, and it must “approve or disapprove the program” after “taking into consideration all comments received.” As EPA explained in its Fifth Circuit brief, if it “were simply acting in a ministerial fashion, such weighing of the merits of public comments would be unnecessary.” Brief for EPA in No. 96-60874 (CA5).